UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH PENLEY #256574,

                Petitioner,                               Hon. Phillip J. Green

v.                                               Case No. 1:20-cv-132

JOHN DAVIDS,

                Respondent.

_____/

## MEMORANDUM OPINION

This matter is before the Court on Kenneth Penley's Petition for Writ of Habeas Corpus.  (ECF No. 1).  Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to proceed in this Court for all further proceedings, including an order of final judgment.  (ECF No. 13-14).  For the reasons discussed herein, the Court concludes that Petitioner is being confined in violation of the United States Constitution.  Accordingly, Penley's petition will be granted.

## BACKGROUND

As a result of the events described herein, Petitioner was charged in Berrien County Circuit Court with sexually assaulting his son on two occasions.  With respect to each of the two alleged incidents, Petitioner was charged with one count each of first degree criminal sexual conduct, second degree criminal sexual conduct,

and assault with the intent to commit criminal sexual penetration. (ECF No. 11-5, PageID.395-97). Following a five-day jury trial, Petitioner was convicted on October 24, 2016, of three of the six counts, those relating to the first alleged incident, but acquitted of the three counts relating to the second alleged incident.

Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Nicole Whitehead**

Nicole Whitehead was employed as a foster care worker for the Michigan Department of Health and Human Services. (ECF No. 11-5, PageID.566). Daniel Kiser was placed into foster care on April 4, 2016. (*Id.,* PageID.567-68). Whitehead was aware that the parental rights of Kiser's parents had been previously terminated, but she did not know when that occurred. (*Id.,* PageID.570).

**Daniel Kiser**

Daniel Kiser is the child of Petitioner and Dana Kiser. (*Id.*, PageID.583). Daniel was adopted, at age two, by Julia and Guy Kiser.[1] (*Id.,* PageID.584). As a result, Daniel did not have much contact with his parents when he was growing up. (*Id.*). When he was twelve years old, Daniel was placed with his grandfather, David Kiser, after being struck in the face by his adopted mother, Julia Kiser. (*Id.,* PageID.585-86).

---

1 There are a number of parties with the last name Kiser. Accordingly, and in order to avoid confusion, the Court will use their first names.

In the summer of 2015, when Daniel was thirteen years old, his biological parents "came back into [his] life."  (*Id.,* PageID.580, 588).  Specifically, Petitioner began attending Daniel's baseball games.  (*Id.,* PageID.588).  Daniel was "happy" about this and the pair began spending time together.  (*Id.,* PageID.589).  Sometime between "mid-summer to fall," Daniel moved in with Petitioner because his grandfather could not afford to care for Daniel.  (*Id.,* PageID.590-91).  Two other people lived in the house with Petitioner and Daniel: Iva Penley and Melissa Watson, Petitioner's mother and then current girlfriend, respectively.  (*Id.,* PageID.592-93).  Petitioner and Melissa shared a bed in one room.  (*Id.,* PageID.594).  Daniel slept in the same room in a separate bed.  (*Id.*).  Iva Penley slept in her own separate bedroom.  (*Id.*).

After moving in with Petitioner, Daniel developed a good relationship with Melissa.  (ECF No. 11-6, PageID.654).  Daniel struggled at school, however, earing Ds and Fs.  (*Id.,* PageID.655).  Daniel was held back multiple grades due to poor grades and behavioral problems.  (*Id.,* PageID.672).  Daniel was also suspended for bad behavior.  (*Id.,* PageID.655).  Daniel was unable to recall if he ever told Melissa that he was unhappy that Petitioner was not spending enough time with him.  (*Id.,* PageID.660-61).

Melissa later moved out of the residence and Petitioner began a relationship with Emily Horvath, who soon became pregnant.  (*Id.,* PageID.661-62).  Daniel denied telling people that Petitioner "better not show the baby more attention" than

him.   (*Id.,* PageID.662).   Daniel also denied telling Iva Penley that, because he was upset, he was "gonna start a rumor" about Petitioner.   (*Id.,* PageID.663).   Daniel later acknowledged, however, that he became "angry" when he sensed Petitioner "starting to drift away" after Emily became pregnant.   (*Id.,* PageID.673).

Daniel testified that Petitioner anally raped him on two separate occasions. (ECF No. 11-5, PageID.596-97, 612-619, ECF No. 11-6, PageID.721,).   During the initial assault, Petitioner grabbed Daniel's arm, choked him, and grabbed his testicles.   (ECF No. 11-5, PageID.597-99; ECF No. 11-6, PageID.692).   After assaulting Daniel, Petitioner threatened to kill him if he told anyone.   (ECF No. 11-5, PageID.619).   Following this initial assault, Daniel returned to the living room and asked Iva Penley, "you know what he did, didn't you?"   (*Id.,* PageID.605).   In response, Iva Penley "just looked at [Daniel] and smiled."   (*Id.*).   At some point following this initial assault, Daniel began "peeing blood."   (*Id.*).

Daniel was unsure how much time transpired between the first and second assault, but he thought it was "about a week or two."   (*Id.,* PageID.612).   Daniel also asserted, however, that several months may have transpired between the two assaults.   (ECF No. 11-6, PageID.670-71, 674-75).   Daniel later testified that the two assaults might have occurred one week apart or might have occurred one day apart.   (*Id.,* PageID.681-82).

Regarding this second assault, Daniel initially said that Petitioner, who was already in his bedroom, called Daniel to the bedroom.   (ECF No. 11-5, PageID.613).

Daniel then changed his testimony, however, and stated that he was already in the bedroom and Petitioner entered the bedroom to assault him.   (*Id.,* PageID.613-14).

Daniel initially testified that this assault occurred when "it was light outside." (*Id.,* PageID.612-13).   But, after being reminded by the prosecutor that he previously testified that the second assault occurred at night, Daniel stated that the second assault took place at "nighttime actually."   (*Id.,* PageID.614).

Daniel testified that, in addition to anally raping him, Petitioner "grabbed" his penis.   (*Id.* PageID.61,7-18).   After assaulting Daniel a second time, Petitioner again threatened to kill him if he told anyone.   (*Id.,* PageID.618-19).   Iva and Emily were both present in the residence when Petitioner assaulted Daniel a second time. (*Id.,* PageID.619-20).   Following this second assault, Daniel continued peeing blood. (*Id*).   The morning after the second assault, Daniel texted Emily and asked her to pick him up and take him to school.   (*Id.,* PageID.621-22).

At some point, Daniel was taken to a hospital where he was catheterized so that he could empty his bladder.   (*Id.,* PageID.625-28).   The catheter insertion was painful for Daniel.   (*Id.,* PageID.626).   Daniel initially testified that he did not see or interact with Petitioner during his hospital visit, but after being prompted by the prosecutor, Daniel asserted that Petitioner did, in fact, enter his room and threaten to kill Daniel if he "told anybody about what happened."   (*Id.,* PageID.627-28).

Daniel denied experiencing any "problems" with his penis or testicles prior to Petitioner assaulting him.   (ECF No. 11-6, PageID.679-81).   Daniel was prescribed

antibiotics following this initial hospital visit.   (ECF No. 11-5, PageID.629).
Petitioner failed, however, to fill the prescription and instead gave Daniel "some of
his pills" that were laying on his dresser.   (*Id.*).

Daniel eventually told his brother, Samuel Kiser, what Petitioner had done to
him.   (*Id.,* PageID.630).   Daniel told Samuel what happened so that he would not
have to return to Petitioner's residence.   (*Id.,* PageID.630-31).   Daniel's schoolmates
knew about the sexual assaults because Petitioner "said something about it on
Facebook" after which Daniel "admitted it to people at school."   (ECF No. 11-6,
PageID.665).

**Dr. Ryan Stringer**

Dr. Ryan Stringer examined Daniel Kiser on April 4, 2016.   (ECF No. 11-6,
PageID.748-49).   Daniel reported that he was experiencing "difficulty with urination
and testicular pain."   (*Id.,* PageID.751).   The doctor noted that Daniel had
previously visited the hospital on March 29, 2016, reporting painful urination, blood
in his urine, and testicular pain and swelling.   (*Id,.* PageID.753).

Treatment notes from Daniel's March 29, 2016, examination indicated that
Daniel was experiencing bilateral testicular swelling.   (*Id.,* PageID.755-56).   Dr.
Stringer's April 4, 2016, examination revealed testicular "discomfort," but no
"swelling."   (*Id.*).   Testing revealed no indication of urinary tract infection or
sexually transmitted disease (STD).   (*Id.,* PageID.756-62).   The doctor also observed
no evidence of bruising on Daniel's penis.   (*Id.,* PageID.782).   The doctor diagnosed

Daniel with urinary retention and epididymis and testicular inflammation. (*Id.,* PageID.756-58).

The doctor indicated that the "most common cause" of epididymis and testicular inflammation is: (1) "testicular torsion"; (2) urinary tract infection or STD; or (3) traumatic injury. (*Id.,* PageID.756-59). Dr. Stringer noted that, when Daniel was examined on March 29, 2016, an ultrasound examination of his testicles was performed, the results of which were "normal." (*Id.,* PageID.762). Based on this result, in addition to his own examination, Dr. Stringer "essentially ruled out testicular torsion" as a cause of Daniel's discomfort. (*Id.,* PageID.762-63). Dr. Stringer further concluded that it was "highly unlikely" that Daniel's discomfort was caused by infection or STD. (*Id.,* PageID.763-64).

The doctor observed that "trauma would certainly be a potential cause for [Daniel's] pain." (*Id.,* PageID.765). The doctor further noted, however, that "there [was] no convincing evidence either to suggest trauma, besides [allegations of] pain." (*Id.,* PageID.766). Treatment notes from Daniel's March 29, 2016 examination indicated that Daniel reported "having an object thrown and striking in his – his scrotum." (*Id.,* PageID.775-76). Dr. Stringer concluded that he was unable to determine, with a reasonable degree of medical certainty, what caused Daniel's testicular discomfort. (*Id.,* PageID.778).

When asked by Dr. Stringer, Daniel "denied sexual abuse."   (*Id.,* PageID.768-69).   When he returned to the hospital two days later, however, Daniel reported (to an unidentified physician) that "his father had touched him."   (*Id.,* PageID.773).

During the April 4, 2016, examination, a catheter was inserted into Daniel's penis to drain his bladder.   (*Id.,* PageID.753-54, 770).   The catheter was not removed during this visit, however.   (*Id.,* PageID.772).   When Daniel returned to the hospital two days later, the catheter was "partially dislodged" causing "significant discomfort."   (*Id.,* PageID.772-72).

During his examination, Dr. Stringer observed no evidence of tenderness or bruising on Daniel's neck or arms.   (*Id.,* PageID.778-79).   The doctor indicated that Daniel's alleged testicular discomfort could have been caused by an object being thrown and striking Daniel in the "testicular area."   (*Id.,* PageID.783).   The doctor also agreed that had Daniel's testicles been grabbed, it "would be potentially expected to cause pain."   (*Id.,* PageID.784-85).

**Alexandra Heit**

As of March 2016, Alexandra Heit was employed as an Investigator for Child Protective Services.   (ECF No. 11-6, PageID.788).   On March 29, 2016, Heit spoke with Daniel Kiser.   (*Id.,* PageID.798-99).   Daniel was "acting normal," but reported that "his private parts hurt."   (*Id.,* PageID.798-801).   Heit did not ask Daniel about the cause or origin of this pain.   (*Id.,* PageID.800-01).   On April 6, 2016, Heit was assigned to investigate a complaint involving Daniel.   (*Id.,* PageID.789-90).   Heit

proceeded to Dana Kiser's residence and, based on Dana's comments, Heit referred Daniel for an interview at the Children's Assessment Center.   (*Id.,* PageID.793-95).

**Amelia Harper**

As of April 12, 2016, Amelia Harper was employed as a "forensic interviewer" at the Children's Assessment Center.   (ECF No. 11-6, PageID.804-08).   On this date, Harper conducted an interview of Daniel Kiser.   (*Id.,* PageID.808).   Daniel reported "two incidents of sexual assault."   (*Id.,* PageID.809).   Daniel reported that the two assaults occurred on consecutive days.   (*Id.,* PageID.810-11, 814-15). Daniel also reported that the first assault occurred between 7:00-8:00 p.m., while Iva Penley was sitting in the living room.   (*Id.,* PageID.811, 814-16).   Daniel reported that the second assault occurred "the next day" at 11:30 p.m., after Iva had gone to bed.   (*Id.*).   Daniel reported that Petitioner grabbed his genitals during both assaults.   (*Id.,* PageID.810-12).

**Samuel Kiser**

Samuel Kiser is Daniel Kiser's older brother.   (ECF No. 11-6, PageID.818). Samuel is "real close" with Daniel.   (*Id.,* PageID.819).   In 2016, "around spring break," Daniel told Samuel that he had been "raped" by Petitioner.   (*Id.,* PageID.820-22).   Samuel's brother, Kenneth Kiser Jr., was present when Daniel reported this. (*Id.,* PageID.821).   Daniel then told his mother.   (*Id.,* PageID.823-24.   Daniel was "shaking" and in "tears" when he reported this.   (*Id.,* PageID.822-23).   Samuel

reported that, "between me and him, [Daniel's] always been truthful." (*Id.,* PageID.834).

**Kenneth Kiser, Jr.**

Kenneth Kiser Jr. is Daniel Kiser's older brother. (ECF No. 11-6, PageID.856). According to Kenneth, Daniel "tells little lies," but "doesn't tell big lies." (*Id.,* PageID.874).

After returning from Daniel's second hospital visit, Kenneth began kidding Daniel about having a sexually transmitted disease." (*Id.,* PageID.872). In response, Daniel declared "that he didn't get no disease from his girlfriend, that dad raped him." (*Id.,* PageID.859). Daniel then told his mother. (*Id.* PageID.859-60). Daniel was "crying" and "upset" when he reported what happened to him. (*Id.,* PageID.860).

Petitioner visited Daniel during one of his hospital visits. (*Id.,* PageID.863). Petitioner asked everybody to leave the room so that he could be alone with Daniel. (*Id.,* PageID.863-64). Petitioner was alone with Daniel for five to ten minutes. (*Id.,* PageID.864). After Petitioner left the room, Daniel appeared "nervous" and "scared." (*Id.*). Daniel then told Kenneth that Petitioner warned him that "if he said anything [he] would kill him." (*Id.,* PageID.866).

**Dana Kiser**

Dana Kiser was previously married to Petitioner. (ECF No. 11-6, PageID.881). Dana and Petitioner divorced in 2016 after being married for

approximately 15 years. (*Id.,* PageID.881-82). Dana and Petitioner are the biological parents of Daniel Kiser. (*Id.*). When Daniel was two years old, Dana and Petitioner's parental rights were terminated after which Daniel went to live with Dana's grandfather. (*Id.,* PageID.882).

In the first week of April 2016, Daniel told his mother that Petitioner "grabbed him by his testicles and held him down to the floor and raped him." (*Id.,* PageID.88, 4-85, 904). Daniel was "crying" and "shaking" when he reported this. (*Id.,* PageID.885). Dana was "shocked" by what her son reported. (*Id.*). After Daniel made this disclosure, Dana and Petitioner exchanged a series of text messages. (*Id.,* PageID.893). In one message, Petitioner wrote, "you and that fag son of yours are sick." (*Id.*). Petitioner later texted, "Fuck you, bitch, and fuck that little faggot. He probably is mad because I didn't want to fuck his faggot ass." (*Id.*).

During one of Daniel's hospital visits, Petitioner asked Dana and the others present to leave the room so that he could be alone with Daniel. (*Id.,* PageID.888-89, 900-01). Petitioner was alone with Daniel for five to ten minutes after which Daniel appeared "sad" and "nervous." (*Id.,* PageID.889-90). Following his disclosure of abuse, Daniel became "extra sensitive" and "extra emotional." (*Id.,* PageID.894). Dana testified that, in her opinion, Daniel "is an honest person." (*Id.,* PageID.894-97).

Dana also testified about her sex life with Petitioner when the two were married. (*Id.,* PageID.899). Specifically, the following exchange occurred between the prosecutor and Dana:

Q: Okay. And how old were you when you first got together with him?

A: We were nineteen. Or I was nineteen. Sorry.

Q: Okay. And how old are you now?

A: Thirty-six.

Q: Thirty-six. Okay. And when you were with the defendant romantically, what kind of sex was he interested in?

A: He was interested in anal sex. We were young. But that – that did apply and it applied frequently throughout our – our sex life. That was something he was interested in. I was – I was young, I was experiencing things and I wasn't closed to it. So, I was – I was rather open to it. And he – you know, to me that is, you know, a little rough. But it can be, depending. But I didn't – I'm just – I'm sorry. I'm thinking of what happened to my son and talking about this. I'm sorry. But that's – that was used on a daily basis a lot of times. Probably if we had sex – we were young. We had sex seven days [a] week. It happened maybe once a day in our sex life.

Q: Anal sex did?

A: Yes.

Q: You said once a day in your sex life?

A: Uh-huh (affirmative).

Q: Okay. So, you frequently had anal sex with the defendant.

A: Yes.

Q:    And was it rough sex?

A:    It could be rough, yes.

(*Id.,* PageID.899-900).

**Teresa Yoakum**

As of April 2016, Teresa Yoakum was employed as a sexual assault nurse examiner.  (ECF No. 11-7, PageID.922-27).   On April 27, 2016, Yoakum examined Daniel Kiser.  (*Id.,* PageID.927).   Daniel reported that he was sexually assaulted by Petitioner.  (*Id.,* PageID.934-37).   Specifically, Daniel reported that Petitioner "grabbed his penis and his testicles" and tried to anally penetrate him.  (*Id.,* PageID.938-39).   Daniel was unsure when the assaults occurred, but indicated they took place "around spring break."  (*Id.,* PageID.937).   Daniel also reported that he went to his mother's house the same day he was assaulted.  (*Id.,* PageID.962).

Daniel reported that he was prescribed antibiotics following one of his hospital visits, but that Petitioner "did not take him to the pharmacy to get those antibiotics filled," but instead gave Daniel some antibiotics that had been prescribed to Petitioner.  (*Id.,* PageID.941).   Daniel only pretended to take this medication, however.  (*Id.,* PageID.942).

A physical examination revealed "some yellow coloring" on Daniel's penis.  (*Id.,* PageID.946-47).   Yoakum was unsure whether this discoloration was due to bruising or merely a product of "different pigmentation."  (*Id.,* PageID.947).   An examination of Daniel's anus revealed the presence of a "bluish color" at the twelve

o'clock position.   (*Id.*, PageID.949-50).   Yoakum observed no signs of infection or injury.   (*Id.*, PageID.951-52, 963).   This was not unexpected given the length of time since Daniel was assaulted.   (*Id.*, PageID.952-54).   Yoakum also noted that the absence of injury does not mean that the alleged assault did not occur.   (*Id.*, PageID.954).

Yoakum examined Daniel a second time on May 18, 2016.   (*Id.*, PageID.954-55).   One of the purposes of this second examination was to determine whether the discoloration she observed during her initial examination was caused by bruising or something else.   (*Id.*).   If the initial discoloration was, in fact, bruising it would not be present by the time Daniel returned for this second examination.   (*Id.*).   This second examination revealed the same two areas of discoloration, on the penis and anus, as the initial examination.   (*Id.*, PageID.955-56).   Yoakum was unable to determine how long this discoloration had been present.   (*Id.*, PageID.962).

Yoakum testified that sexual assault victims may experience various changes in behavior, including nightmares, altered eating habits, inability falling asleep, depression, isolation, aggression, difficulty trusting others, and altered bathroom habits.   (*Id.*, PageID.958-60).   Yoakum stated that kids may delay reporting abuse if they have been threatened.   (*Id.*, PageID.960).   She acknowledged that, if a catheter once inserted, were "halfway pulled out," it would cause pain and potentially even bruising of the penis.   (*Id.*, PageID.964-65).

**Brooke Rospierski**

Brooke Rospierski was a supervisor at the Children's Assessment Center where Amelia Harper interviewed Daniel Kiser.  (ECF No. 11-7, PageID.973-86). Rospierski reviewed Harper's report of her interview of Kiser and concluded that Harper "compl[ied] with the forensic interviewing protocol."  (*Id.,* PageID.985-86). Rospierski indicated that victims respond differently to sexual assault and may delay reporting if they feel threatened.   (*Id.,* PageID.986-995).

Rospierski concluded that Daniel Kiser's allegations against Petitioner constituted "a valid disclosure" of sexual assault.  (*Id.,* PageID.1004).   Rospierski reached this conclusion despite never actually speaking with Kiser and without any knowledge that Kiser had provided conflicting statements to the police and others regarding the dates and circumstances of his alleged assault.  (*Id.,* PageID.997-1004).   When asked whether providing conflicting information about an alleged assault would "raise a red flag" regarding such allegations, Rospierski merely agreed that "it's possible."  (*Id.,* PageID.998-1000).   Rospierski also disagreed that it would be helpful for a forensic interviewer to know whether a child "has a history of lying." (*Id.,* PageID.1002-03).

**David Kiser**

David Kiser is Daniel Kiser's maternal grandfather.   (ECF No. 11-7, PageID.1010-11).   Daniel moved in with his grandfather in the spring of 2015 and lived there until he moved out in August 2015 to live with Petitioner.   (*Id.,*

PageID.1011-15).   In December 2015, Daniel asked his grandfather if he could come back and live with him.   (*Id.,* PageID.1026).   Daniel told his grandfather, "I want out of here."   (*Id.,* PageID.1029).   Daniel wanted to leave Petitioner's house because he was arguing with Petitioner's girlfriend and was "bored a lot."   (*Id.*).   Daniel also did not like that he was not eating as well as when he lived with David.   (*Id.,* PageID.1030).

Daniel was placed back in his grandfather's care by Child Protective Services on April 6, 2016.   (*Id.,* PageID.1015-17).   A "couple of days" later, Daniel reported that Petitioner "touched" him.   (*Id.,* PageID.1017).   David responded by taking Daniel to counseling.   (*Id.,* PageID.1018).   Daniel continued to live with his grandfather for approximately six weeks during which time David observed "quite a bit" of changes in Daniel's behavior.   (*Id.*).   For example, David grounded Daniel from going to a certain park after David learned that Daniel asked a girl "if she wanted to do a sexual act on him."   (*Id.,* PageID.1018-19).   David also noticed that Daniel "didn't want to get out" and instead "stay[ed] in his room more."   (*Id.,* PageID.1019-21).   David did not observe this kind of behavior from Daniel previously.   (*Id.,* PageID.1020-21).

**Iva Penley**

Iva Penley is Petitioner's mother.   (ECF No. 11-7, PageID.1039).   Petitioner had been living with mother for the previous two years.   (*Id.,* PageID.1041).   Daniel Kiser moved in with Petitioner and Iva in 2015 and lived there for approximately

seven months.  (*Id.,* PageID.1040-41).   After Daniel moved in, his relationship with Iva Penley was "fairly good" until Daniel "started lying."  (*Id.,* PageID.1043).   Iva considered Daniel to be a "dishonest person."  (*Id.,* PageID.1072).

Daniel's relationship with Petitioner was "good for a while."  (*Id.,* PageID.1044).   Petitioner, however, would often visit his girlfriend's house and "stay gone" for three or four days at a time.  (*Id.,* PageID.1049).   After residing with Petitioner and Iva Penley for a "couple months," Daniel began telling Iva that he wanted to move somewhere else.  (*Id.,* PageID.1058-59).   Daniel repeated his desire to live elsewhere "a lot of times."  (*Id.,* PageID.1059).   Daniel later told Iva that he "was gonna start a rumor on" Petitioner.  (*Id.,* PageID.1069).

Iva Penley testified that there was never an incident where Daniel exited his bedroom upset or asked Iva if she knew what Petitioner had just done to him.  (*Id.,* PageID.1052).   Iva also testified that her house was so small that she would have heard if Daniel had been thrown down on the bed and assaulted like he alleged.  (*Id.,* PageID.1064-65).   Daniel played sports but would "always get hurt" and complain that his "privates" hurt.  (*Id.,* PageID.1059-60, 1071).   Daniel's complaints in this regard would "flare up" if he did not get the attention he craved.  (*Id.,* PageID.1060).

**Emily Horvath**

Emily Horvath testified that she was presently Petitioner's girlfriend.  (ECF No. 11-7, PageID.1073-74).   Petitioner and Emily began dating the fall of 2015.  (*Id.,* PageID.1074-75).   Emily did not live with Petitioner while Daniel Kiser was living

there.   (*Id.,* PageID.1075-76).   Instead, Petitioner stayed at Emily's house "most nights."   (*Id.,* PageID.1080, 1085).   Nonetheless, Emily did "pop in and out" of Petitioner's residence during this time.   (*Id.,* PageID.1075-76).

According to Horvath, Petitioner's residence was so small, and the doors and walls so thin, that when she was in the bedroom she was able to hear what was happening throughout the house.   (*Id.,* PageID.1116).   Thus, she would have been able to hear if somebody had thrown down on the bed and assaulted as Daniel alleged. (*Id.,* PageID.1115-16).   Because Petitioner was "busy with work," he "wasn't around as much as he wanted to be. . .and that bothered [Daniel]" (*Id.,* PageID.1077).   Daniel "wanted his dad in his life" and was "sad" that Petitioner was unable to spend more time with him.   (*Id.,* PageID.1078).

On March 17, 2016, Horvath received a Facebook message from Daniel.   (*Id.,* PageID.1081).   Daniel asked Horvath to pick him up at Petitioner's house and take him to school.   (*Id.*).   Horvath agreed and did not discern anything unusual about Daniel when she picked him up.   (*Id.,* PageId.1081-82).   According to Horvath, Daniel "was actually fine, 'cause we had hung out the night the – the – the day before. We hung out, went out into the woods and went shed hunting for deer antlers and stuff."   (*Id.,* PageID.1082).   The previous night, Horvath and Daniel had been in the woods looking for deer antlers until approximately 8:00 p.m.   (*Id.,* PageID.1114). When they arrived back at Petitioner's residence, Petitioner was waiting outside.

18

(*Id.*).   Daniel then entered the house and Petitioner left to spend the night with Horvath.   (*Id.,* PageID.1114-15).

Horvath took Daniel to the hospital on March 29, 2016.   (*Id.,* PageID.1086). Daniel reported that he thought he had caught a sexually transmitted disease from his girlfriend.   (*Id.,* PageID.1113).   Horvath had never before witnessed Daniel complain of groin pain.   (*Id.,* PageID.1086-87).   Regarding the door to Petitioner's bedroom, Horvath indicated that "there is a lock on the door handle, but it doesn't work."   (*Id.,* PageID.1090).   She indicated that there was a padlock on the outside of the door, but no way to lock the door from inside the bedroom.   (*Id.,* PageID.1090-92).   As for whether she had an opinion regarding Daniel's honesty, Horvath asserted that Daniel is "a very dishonest person."   (*Id.,* PageID.1133).

During Horvath's examination, the prosecutor played selected portions of several conversations between Horvath and Petitioner, which were recorded while Petitioner was in jail awaiting trial.   (*Id.,* PageID.1093-1109, 1127-32).   The administrative record provided to this Court, however, contains neither the recordings of these conversations nor transcripts thereof.

**Cory Peek**

Cory Peek was a detective for an unidentified county sheriff's department. (ECF No. 11-7, PageID.1136).   As part of his participation in this matter, Peek analyzed cell phones belonging to Daniel Kiser, Dana Penley, Emily Horvath, and

Petitioner.   (*Id.,* PageID.1136-38).   An examination of Petitioner's phone revealed the presence of fourteen text messages.   (*Id.,* PageID.1138-1142).

**Wesley Koza**

As of May 11, 2016, Wesley Koza was a Patrolman for the Baroda Lake Township Police Department.   (ECF No. 11-7, PageID.1143-45).   On this date, Koza was dispatched to speak with Petitioner regarding a sexual assault complaint.   (*Id.,* PageID.1145).   Koza met Petitioner at his residence.   (*Id.*).

Petitioner and Iva Penley gave Koza consent to "walk in the house and look in the house."   (*Id.,* PageID.1145-46).   Koza was not "paying much attention to the [bedroom] door and the lock on the door."   (*Id.,* PageID.1146-49).   Images recovered from Koza's body camera, however, appear to show the presence of a lock on the inside of the bedroom door in the location Daniel Kiser described in his preliminary examination testimony.   (*Id.,* PageID.1149-56).[2]

On June 1, 2016, Koza met with Daniel.   (*Id.,* PageID.1156).   Daniel reported that Petitioner sexually assaulted him twice and threatened to kill him if he told anyone.   (*Id.,* PageID.1157-60).   Specifically, Daniel reported that Petitioner threw him down on the bed and penetrated him anally and also grabbed his "crotch."   (*Id.,* PageID.1158-64).   Daniel reported that following the initial assault, he went out to the living room where Iva Penley was sitting.   (*Id.,* PageID.1160-61).   Daniel was

---

2 The images in question do not appear to be contained in the administrative record submitted to the Court.

"crying and upset," but Iva just acted like "she knew what happened to him."   (*Id.,* PageID.1161).   Daniel reported that following the second assault, he "stayed in his room the rest of the night."   (*Id.,* PageID.1164).

Daniel reported that the initial assault occurred "around" or "before" Christmas (*id.,* PageID.1161, 1171), and that the second occurred "about a week after the first."   (*Id.,* PageID.1162, 1172).   Daniel further reported that he first went to the hospital "two weeks after" the initial assault.   (*Id.,* PageID.1162).

**Petitioner's Testimony**

Before jury selection, the trial judge decided, outside the presence of the potential jurors, that, as a "reasonable and necessary security measure," Petitioner was to be shackled to the floor during trial.[3]   (ECF No. 11-5, PageID.380-89).   The trial judge confirmed that Petitioner's shackles would not be visible to the jury.   (*Id.,* PageID.388).   The trial judge further stated that, "if [Petitioner] decides that he wishes to testify, we will, of course, take steps to allow that testimony without the jury being aware that [Petitioner] is shackled while he's sitting in the witness chair, while the jury comes in."   (*Id.,* PageID.389).

At the conclusion of the prosecution's case in chief, the following exchange occurred – in the jury's presence – between the trial judge, the prosecutor, and Petitioner's counsel:

---

[3] As discussed below, the basis for placing Petitioner in shackles was dubious.

| | |
|---|---|
| The Court: | Are you ready, Mr. Jesse?[4] |
| Mr. Jesse: | We are, your Honor. |
| The Court: | Ms. Wainwright? |
| Ms. Wainwright: | Yes, your Honor. |
| The Court: | Call your first witness, - - |
| Mr. Jesse: | We call - - |
| The Court: | - - Mr. Jesse. |
| Mr. Jesse: | - - Mr. Penley. |
| The Court: | Mr. Penley, come on up here.   Let's take a short break in the jury room.[5] |
| Mr. Jesse: | Your Honor, I don't have a problem with it.   He admits he's in jail; he's in jail now.   We aren't trying to hide that. |
| The Court: | All right. |
| Mr. Jesse: | So, I - - I have no problem with that. |
| The Court: | All right. |
| Mr. Jesse: | So - - so, just unchain him so he can go - - |
| Petitioner: | Yeah. |

(ECF No. 11-8, PageID.1192-93).

---

4 James Jesse represented Petitioner and Jane Wainwright represented the State.

5 There can be little doubt that the trial judge's desire to "take a short break" was to enable Petitioner to take the witness stand without the jury observing that he was in shackles.

22

The trial judge made no attempt to clarify what, if anything, Petitioner intended by his unprompted uttering of the single word, "yeah."   Thus, the trial court failed to determine if Petitioner agreed with his counsel's strange decision.   Instead, the jury observed that Petitioner was shackled to the floor and then observed Petitioner being led to the witness stand in shackles.

Petitioner acknowledged that he had a lengthy criminal record.   Specifically, Petitioner acknowledged the following convictions: (1) "marijuana charge" in 1990; (2) breaking and entering in 1993; (3) possession of counterfeit bank notes and second-degree home invasion in 2004; (4) possession of methamphetamine in 2011. (*Id.,* PageID.1197-98).   Petitioner acknowledged twice serving time in prison for some of these offenses.   (*Id.,* PageID.1198).   Petitioner stated that "every time I've been charged with a crime, I've took my responsibility and faced my time."   (*Id.*). Petitioner further asserted, however, that he had never been accused of, or charged with, a sex crime.   (*Id.*).

Petitioner testified that his parental rights, vis-à-vis, Daniel Kiser were terminated in 2004, following his conviction for possession of counterfeit bank notes. (*Id.,* PageID.1195, 1199).   Subsequently, Petitioner did not have contact with Daniel until the summer of 2015.   (*Id.,* PageID.1195-97).   Daniel's grandfather asked Petitioner to attend some of Daniel's baseball games.   (*Id,.* PageID.1197). Petitioner learned that Daniel and his grandfather "were having issues."   (*Id.,* PageID.1200).   Daniel "wanted to go live with his mom," but Daniel's grandfather

decided against that.   (*Id.,* PageID.1200-01).   Instead, Daniel went to live with Petitioner and Petitioner's mother.   (*Id.*, PageID.1201).   Daniel was not excited about going to live with Petitioner.   (*Id.,* PageID.1247-48).

Daniel began having difficulty at school because "he was getting into fights with the boys at school all the time."   (*Id.,* PageID.1202).   When Daniel moved in with Petitioner, Melissa Watson was living with Petitioner.   (*Id.,* PageID.1201). Watson accompanied Petitioner to Daniel's school events and cooked at home "a lot." (*Id.*, PageID.1204).   Daniel did not "hang out" with Petitioner that much but instead "mainly hung out with Melissa [Watson]."   (*Id.,* PageID.1247).

In early 2016, however, Petitioner began a relationship with Emily Horvath at which point Watson moved out of Petitioner's residence.   (*Id.,* PageID.1204-05). Horvath did not move in with Petitioner, however, but continued to maintain her own residence.   (*Id.,* PageID.1205).   Daniel was "angry" about this because Watson "was no longer there for him."   (*Id.*).   Daniel was also "mad and upset" that Petitioner was working long hours and was at Horvath's house "all the time."   (*Id.,* PageID.1206-08, 1251).   Daniel was "bored" and stated that he wanted to move in with his mother.   (*Id.,* PageID.1206).   Daniel also "was not happy" when he learned that Horvath was pregnant.   (*Id.,* PageID.1207).

On the occasion that Horvath took Daniel to the hospital, Petitioner visited Daniel later that day.   (*Id.,* PageID.1210-11).   Petitioner denied ever speaking with Daniel alone, however.   (*Id.,* PageID.1211-12).   Petitioner also denied being given a

prescription to fill for Daniel.  (*Id., * PageID.1213).  According to Petitioner, the prescription for Daniel was given to Daniel's mother because she was the one who was present when Daniel was discharged from the hospital.  (*Id,.* PageID.1213-14).  Petitioner denied ever sexually assaulting Daniel.  (*Id,.* PageID.1221, 1227-29).  Petitioner likewise denied even being in the bedroom with Daniel with the door locked.  (*Id., * PageID.1221-22).

**Melissa Watson**

By the summer of 2015, Melissa Watson had been in a relationship with Petitioner for more than six years.  (ECF No. 11-8, PageID.1273).  Daniel Kiser moved in with Petitioner and Watson around the beginning of August 2015.  (*Id.,* PageID.1274).  When Daniel first moved in, he "was happy to around his dad."  (*Id.*).  At the outset, Petitioner, Watson, and Daniel "had a good family relationship."  (*Id.,* PageID.1277).  The three "did things together" and "hung out together."  (*Id.*).  Daniel even started calling Watson "mom."  (*Id.,* PageID.1288-89).

Watson noted that Petitioner's residence was small and that she could easily hear from one room what was occurring in other rooms of the house.  (*Id.,* PageID.1280-82).  Had Daniel been thrown down on a bed and assaulted as he alleged, Watson was confident that activity would be audible throughout the house.  (*Id.,* PageID.1281-82).

Watson noted that Daniel often complained of "groin pain."  (*Id.,* PageID.1275).  She recalled one episode where Daniel "grab[bed] himself and he fell

on the floor" and said that "his parts hurt."   (*Id.*).   Watson concluded that Daniel was doing this "for attention."   (*Id.,* PageID.1276).

Watson moved out of Petitioner's residence in January 2016.   (*Id.,* PageID.1278).   At this point, Daniel had "failing" grades at school and had "multiple missing homework assignments."   (*Id.*).   Daniel's mood was inconsistent, "some days he was in a great mood, some days he was mad, [and] some days he wouldn't speak to you."   (*Id.*).   Watson twice had to pick Daniel up from school for fighting. (*Id.,* PageID.1278-79).

**Tammy Wilson**

Tammy Wilson is Petitioner's sister.   (ECF No. 11-8, PageID.1325).   On August 14, 2015, Child Protective Services (CPS) appointed Wilson legal guardian of Daniel Kiser.   (*Id.,* PageID.1307-08).   Wilson, with CPS approval, allowed Daniel to go live with Petitioner.   (*Id.,* PageID.1321-22).   According to Wilson, Daniel "definitely wanted to go stay with his dad" because "he wanted a relationship with his dad."   (*Id.,* PageID.1322).   After Daniel moved in with Petitioner, Wilson continued to have regular contact with Daniel.   (*Id.,* PageID.1309).   As Daniel's guardian, Wilson signed up Daniel for several sports, but he was unable to participate because "his grades were straight Fs."   (*Id.,* PageID.1309-10).

Daniel visited Wilson's home "quite a bit" to hang out with her son.   (*Id.,* PageID.1311).   Wilson terminated this relationship, however, because Daniel "would act out . . . cussing, talking dirty . . . and [Wilson] didn't want to expose [her] son to

26

that kind of behavior." (*Id.*).   Daniel became "angry and withdrawn."   (*Id.*, PageID.1312).   Daniel also had a propensity for being "overly dramatic."   (*Id.*, PageID.1313-14).   In this respect, Wilson described an incident in which Daniel suffered a bloody nose at school and "insisted" on being driven to the Emergency Room in an ambulance.   (*Id.*, PageID.1313).   Wilson testified that Daniel "lies quite a bit."   (*Id.*, PageID.1315-16).

Following the presentation of evidence, the jury split its verdict.   Specifically, the jury found Petitioner guilty of the offenses concerning one of the alleged assaults of Daniel Kiser but acquitted Petitioner of the offenses related to the second alleged assault.   Thus, Petitioner was found guilty of one count each of: (1) first degree criminal sexual conduct; (2) second degree criminal sexual conduct; and (3) assault with the intent to commit criminal sexual penetration.   (ECF No. 11-9, PageID.1595-96).   Petitioner was likewise found not guilty of one count each of: (1) first degree criminal sexual conduct; (2) second degree criminal sexual conduct; and (3) assault with the intent to commit criminal sexual penetration.   (*Id.*, PageID.1596).

Petitioner, as a fourth felony offender, was sentenced to serve fifteen to thirty years in prison.   (ECF No. 11-9, PageID.1599; ECF No. 11-10, PageID.1639). Petitioner subsequently moved in the trial court for a new trial.   (ECF No. 11-13, PageID.1882-83).

Petitioner's motion for a new trial was denied.   (ECF No. 11-13, PageID.2009-23).   Petitioner then appealed his convictions in the Michigan Court of Appeals asserting the following claims:

I.  Defendant was denied his Sixth Amendment right to the effective assistance of trial counsel.   Trial counsel pursued a self-defeating and unsound "destroy Defendant's credibility to build up his credibility" strategy, that involved placing Penley's irrelevant criminal history before the jury, not objecting to inadmissible evidence about Penley's purported sex life from his ex-wife, the suicide of a son, and allowing Penley to appear shackled before the jury.   Trial counsel did not respond to improper opinion testimony from an expert, misrepresentations regarding medical evidence, and failed to give a proper closing argument, instead adopting positions that favored the prosecution.   The error prejudiced the outcome of this trial where the jury nearly deadlocked before returning a compromise verdict.

A.  Trial counsel did not provide effective assistance by sitting in silence while Mr. Penley's ex-wife accused Mr. Penley of an obsession with anal and sometimes rough sex in a case in which he is accused of anal rape.   The error prejudiced the outcome of the trial where the record shows the jury struggled over its verdicts.

B.  Trial counsel provided ineffective assistance when he placed Mr. Penley's criminal history, including incarcerations, inadmissible convictions, parole violations, and claims of domestic violence before the jury in a self-defeating and unsound "destroy credibility to establish credibility" strategy.   The error prejudiced the outcome of the trial where the record shows the jury struggled over its verdicts.

C.  Trial counsel did not provide effective assistance by sitting in silence while the jury was told that Penley's other son, Brandon, committed suicide because he did not want to be like Penley.   The

error prejudiced the outcome of the trial where the record shows the jury struggled over its verdicts.

D.     Trial Counsel did not provide effective assistance in failing to object to hearsay from multiple witnesses luridly repeating Complainant's (Daniel's) allegations told to them outside of court. The testimony prejudiced the outcome.

E.     Trial counsel did not provide effective assistance when he failed to object when the prosecution's expert on child sexual abuse violated *Peterson* by twice stating that Daniel's accusations were "a valid disclosure of sexual contact." The jury would understand "valid" to mean "truthful."

F.     Trial counsel did not provide effective assistance when he failed to object or at least respond in his closing argument to the prosecution's misrepresentation of facts in its closing regarding medical findings made by the emergency room physician and nurse called at trial. The error prejudiced the outcome.

G.     Trial counsel made errors during his closing which prejudiced the outcome. He lessened the prosecution's burden, adopted positions favorable to the prosecution, and failed to respond to the prosecution's argument.

H.     Trial counsel said that it did not concern him that Penley was shackled to the floor in the view of the jury. He allowed it to occur and tried to waive the error.

I.     Trial counsel informed the court that he had evidence that Daniel had made prior false accusations of rape, which he then suddenly and opaquely abandoned.

II.   The prosecution denied defendant his right to a fair trial through misconduct or error.

29

III.     The jury reached an impermissible compromise verdict.

(ECF No. 11-13, PageID.2027-28).

The Michigan Court of Appeals affirmed Petitioner's convictions.   *People v. Penley*, 2018 WL 6709325 (Mich. Ct. App., Dec. 20, 2018) (per curiam).   Petitioner's subsequent motion for leave to appeal was denied by the Michigan Supreme Court. *People v. Penley*, 933 N.W.2d 37 (Mich. 2019).   Petitioner later initiated the present action in which he asserts the claims identified herein.

## STANDARD OF REVIEW

Penley's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.   The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are

given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

As the Supreme Court recently emphasized, this standard is "intentionally difficult

to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

Pursuant to Section 2254(d)(1), a decision is "contrary to" clearly established

federal law when "the state court arrives at a conclusion opposite to that reached by

[the Supreme] Court on a question of law" or "if the state court confronts facts that

are materially indistinguishable from a relevant Supreme Court precedent and

arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010)

(quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).   A writ may not issue simply

because the reviewing court "concludes in its independent judgment that the relevant

state-court decision applied clearly established federal law erroneously or

incorrectly." *Williams,* 529 U.S. at 411.   Rather, the Court must also find the state

court's application thereof to be *objectively* unreasonable.   *Bell*, 535 U.S. at 694;

*Williams*, 529 U.S. at 409-12.

Pursuant to Section 2254(d)(2), when reviewing whether the decision of the

state court was based on an unreasonable determination of the facts in light of the

evidence presented, the "factual determination by [the] state courts are presumed

correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at

308.   Accordingly, a decision "adjudicated on the merits in a state court and based

on a factual determination will not be overturned on factual grounds unless

objectively unreasonable in light of the evidence presented in the state-court proceeding." *Ibid.*

As previously noted, Section 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy either subsection therein.  This requirement, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  *Harrington v. Richter*, 562 U.S. 86, 100 (2011).  Instead, if a state court rejects a federal claim, a federal habeas court "*must presume* that the federal claim was adjudicated on the merits."  *Johnson v. Williams*, 568 U.S. 289, 301 (2013).  If this presumption is overcome, however, the Court reviews the matter de novo.  *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

## <u>ANALYSIS</u>

### I.   **Compromise Verdict**

As discussed above, Daniel Kiser alleged that Petitioner sexually assaulted him on two separate occasions.  Petitioner was charged with six offenses, three offenses arising from each alleged incident.  The jury convicted on three counts related to one incident and acquitted on three counts related to the other incident. Petitioner argues that the jury's verdicts represent an "impermissible compromise," which violates his right to due process.

First, while the jury's verdicts may appear inconsistent, there is a possible explanation for its decision that does not constitute inconsistency.  The jury may have believed Kiser's allegation as to the initial assault, but given Kiser's inconsistent testimony regarding the timing of the second assault, simply found that the State failed to meet its burden as to the charges stemming from the second assault.  The Michigan Court of Appeals, in denying Petitioner's claim, recognized this very possibility.  *Penley*, 2018 WL 6709325 at *12.  Furthermore, even if this Court assumes that the jury's verdicts were inconsistent, the United States Supreme Court long ago held that "inconsistency in a verdict is not a sufficient reason for setting it aside."  *Harris v. Rivera*, 454 U.S. 339, 345 (1981); *see also*, *Tackett v. Trierweiler*, 956 F.3d 358, 372 (6th Cir. 2020) (citing *Harris*, 454 U.S. at 345).

The Michigan Court of Appeals denied this claim.  This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, the court's decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim presents no basis for habeas relief.

## II.    Prosecutorial Misconduct

Petitioner alleges that his right to a fair trial was violated by several instances of misconduct by the prosecuting attorney.  Specifically, Petitioner argues that the prosecutor presented improper testimony and misrepresented evidence in her closing argument.   Each of Petitioner's claims is addressed separately below.

A.       Prosecutorial Misconduct Standard

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."   *Cockream v. Jones*, 382 Fed. Appx. 479, 484 (6th Cir., June 29, 2010) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).   The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."   *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

The Court employs a two-part test to assess claims of prosecutorial misconduct. The Court must first determine whether the challenged conduct was improper.   *See Stermer v. Warren*, 959 F.3d 704, 724-25 (6th Cir. 2020) (citing *Darden v. Wainwright*, 477 U.S. 168, 180 (1986)).   If the prosecutor's conduct was improper, the question becomes whether such conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."   *Stermer*, 959 F.3d at 725-26 (quoting *Darden*, 477 U.S. at 181)).

To resolve this latter query, the prosecutor's conduct "must be examined within the context of the trial to determine whether [such] amounted to prejudicial error." *Stermer*, 959 F.3d at 726 (citing *United States v. Young*, 470 U.S. 1, 12 (1985)). Stated differently, "the Court must consider the probable effect the prosecutor's [conduct]would have on the jury's ability to judge the evidence fairly."   *Stermer*, 959 F.3d at 726 (citing *Young*, 470 U.S. at 12).   While not an exhaustive list, the following

34

factors are relevant when making this assessment: (1) the weight of the evidence against the petitioner; (2) the "tactical context" of the prosecutor's conduct; (3) whether the conduct was "invited by" the petitioner's conduct; and (4) the nature and frequency of the prosecutor's improper conduct.  *Stermer*, 959 F.3d at 726 (citations omitted).

The Court must bear in mind that the prosecutorial misconduct standard articulated by the Supreme Court is "highly generalized."  *Ibid.* (quoting *Parker v. Matthews*, 567 U.S. 37, 49 (2012)).  As the Supreme Court has further observed, "the more general the rule at issue – and thus the greater potential for reasoned disagreement among fair-minded judges – the more leeway state courts have in reaching outcomes in case-by-case determinations."  *Renico v. Lett*, 559 U.S. 766, 776 (2010).  Finally, when assessing claims of prosecutorial misconduct, the Court must remember that the goal is not "punishment of society for the misdeeds of the prosecutor, but avoidance of an unfair trial to the accused."  *Richardson v. Palmer*, 941 F.3d 838, 854 (6th Cir. 2019).

B.    Procedural Default

Under the procedural default doctrine, federal habeas review is barred where a state court declined to address Petitioner's claims because of a failure to satisfy state procedural requirements.  *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  Where Petitioner's claims have been procedurally defaulted, the state court

judgment rests on an independent and adequate state ground precluding review by a federal court.   *See Coleman*, 501 U.S. at 750-51; *Richardson*, 941 F.3d at 847.

The Court employs a multi-part test to determine if a petitioner has procedurally defaulted an issue: (1) there must exist a state procedural rule that is applicable to the claim and with which the petitioner failed to comply, (2) the last reasoned state court decision on the matter actually enforced the procedural rule, and (3) application of the state procedural rule constitutes an "independent and adequate" state ground on which the state can rely to foreclose review of a federal constitutional claim.   *See Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004).   The Court can, however, overlook procedural default and review the merits of a claim if the petitioner demonstrates: (1) cause for the default and actual prejudice therefrom, or (2) that the failure to consider the claim will result in a fundamental miscarriage of justice.   *See Theriot v. Vashaw*, 982 F.3d 999, 1003 (6th Cir. 2020).

Petitioner presented his prosecutorial misconduct claims to the Michigan Court of Appeals, which concluded that these claims were waived because Petitioner's counsel "did not object at trial."   *Penley*, 2018 WL 6709325 at *10.   Because this was the last reasoned decision on these claims, Petitioner has procedurally defaulted them.   As detailed below, the failure by Petitioner's counsel to object to, or otherwise respond to, much of the conduct in question deprived Petitioner of the right to the effective assistance of counsel.   As such, Petitioner can likely overcome the cause and prejudice hurdle necessary to have these claims addressed on the merits.

Nevertheless, rather than navigate difficult questions of procedural default, the Court opts to simply address Petitioner's prosecutorial misconduct claims on the merits. Because the Court finds that these claims do not entitle Petitioner to relief, Respondent is not prejudiced by this approach.

### C. Questioning Petitioner's Ex-Wife about their Sex Life

As detailed above, the prosecutor elicited from Dana Kiser testimony that she and Petitioner "frequently" engaged in anal sex and, moreover, that "it could be rough." Petitioner argues that this testimony constitutes improper character evidence "offered to cause the jury to loathe" him. The Michigan Court of Appeals found that, while it was misconduct for the prosecutor to elicit this testimony, it did not deprive Petitioner of a fair trial. *Penley*, 2018 WL 6709325 at *10.

Were the Court reviewing this matter in the first instance, it would likely rule differently; but given the applicable standard the Court must agree with this assessment. The topic was not further explored by the prosecutor and she did not make reference to such in her closing argument. Moreover, as the Michigan Court of Appeals recognized, "a proper objection could have cured any prejudicial effect from the testimony." *Id.*

In sum, the decision by the Michigan Court of Appeals denying this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, the court's decision was not based on an unreasonable

37

determination of the facts in light of the evidence presented.   Accordingly, the Court rejects this claim.

### D.     Report of Daniel Kiser's Examination

As previously noted, Teresa Yoakum examined Daniel Kiser on April 27, 2016. Yoakum testified that Daniel disclosed that his brother, Brandon, committed suicide and "left a note after his suicide saying that he didn't want to be like his dad."   (ECF No. 11-7, PageID.969-70).   As part of her examination, Yoakum completed a report that the prosecutor moved to admit into evidence.   (*Id.,* PageID.969).   Petitioner's counsel responded to this request by stating, "no objection."   (*Id.*).   As discussed below, Yoakum's report contained unfairly prejudicial hearsay statements by Daniel. Petitioner argues that it was improper for the prosecutor to elicit testimony regarding the suicide note and, furthermore, to seek the admission of Yoakum's report.

The Michigan Court of Appeals reasonably denied this claim.   *Penley*, 2018 WL 6709325 at *11.   With respect to the fact of Brandon's suicide, as Petitioner's counsel acknowledged at the *Ginther* hearing, he intended to rely on the fact of Brandon's suicide to argue that Petitioner would never have sexually assaulted Daniel because he did not want to lose another son.   (ECF No. 11-12, PageID.1734-35, 1743-55).   Petitioner can hardly claim to have suffered unfair prejudice from the admission of testimony upon which he also intended to rely.

The decision denying this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, the court's decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, the Court rejects this claim.

E.      Improper Opinion Testimony

As discussed above, Amelia Harper interviewed Daniel Kiser at the Children's Assessment Center.   Brooke Rospierski testified concerning her opinion of Harper's interview and the statements Daniel made to Harper.   Specifically, Rospierski concluded that Daniel's allegations against Petitioner constituted "a valid disclosure" of sexual assault.   (ECF No. 11-7, PageID.1003-07).   Petitioner argues that, because the "word 'valid' is a synonym for 'truthful' or 'accurate,'" the prosecution's questioning of Rospierski "deliberately placed before the jury improper opinion testimony" concerning Petitioner's guilt.

Rospierski used the term "valid" on four occasions during her testimony.   The first instance was in response to a question from the prosecutor asking Rospierski to describe the ranges of reactions exhibited by rape victims.   (ECF No. 11-7, PageID.987).   In response, Rospierski indicated that "children display a wide range of behaviors or indicators when they're talking."   (*Id.*).   She then indicated that "we tend not to base how a kid reacts on whether or not it's a valid disclosure of sexual contact, because they can display a wide range of emotions."   (*Id.*).

39

The second instance in which Rospierski used the term "valid" was in response to questioning by Petitioner's counsel.   Specifically, counsel asked Rospierski if she even considered whether the statements Daniel made to Harper were inconsistent with statements Daniel made to others.   (*Id.*, PageID.1003).   In response, Rospierski offered several statements, culminating with "[d]uring that interview I thought that he was consistent in his statements.   He provided several sensory details of what had happened to his body.   And I consider that, what he said during that inter – a valid disclosure of sexual contact."   (*Id.*, PageID.1003-04).

The prosecutor later revisited this point, asking Rospierski if she "had anything to say" on the topic of the "details and consistency" provided by an alleged assault victim.   (*Id.*, PageID.1005).   In response, Rospierski stated:

> Major details like – you know, I think it just goes back to looking at that interview and that child as a whole and not taking things out of context. And so, if that child has been consistent with what's happened and they're able to provide those specific and sensory details, that's what we're looking for in consistency and saying it's a valid disclosure or not."

(*Id.*, PageID.1005-06).

Finally, the prosecutor asked Rospierski, "and, again, from reviewing the interview of Daniel, he provided a valid disclosure?" to which Rospierski responded, "correct."   (*Id.*, PageID.1007).

The Michigan Court of Appeals rejected this claim, apparently relying on the same rationale it articulated to deny Petitioner's ineffective assistance of counsel claim based on the same underlying facts.   In this respect, the court observed that

"Rospierski's use of the word 'valid' referred to the process by which the disclosure was obtained and not to what [Daniel Kiser] actually said."  *Penley*, 2018 WL 6709325 at *5.   As discussed below, the Court finds this rationale both unreasonable and unsupported by the record.   Nonetheless, Petitioner is not entitled to relief on this claim because he cannot establish that the prosecutor's questioning of Rospierski "so infected the trial with unfairness as to make the resulting conviction a denial of due process."

As noted, Rospierski's initial use of the term valid was in response to a question from the prosecutor.   This response, however, did not assert that Daniel's allegations were valid, but rather, merely that the validity of a child's allegations is not determined by how the child reacts.   The first instance in which Rospierski asserted that Daniel's allegations of assault were valid was in response to questioning by Petitioner's counsel.   Rospierski subsequently used the term two more times in response to questioning by the prosecutor reasonably prompted by Petitioner's questioning.   Intentionally or not, it was Petitioner who initially elicited the objectionable testimony.   Fault for such cannot be laid at the prosecutor's feet. Likewise, it hardly constitutes a denial of due process for the prosecutor to briefly revisit a matter initially elicited by Petitioner.

The decision denying this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, the

court's decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, the Court rejects this claim.

F.   Misrepresentations by the Prosecutor in her Closing Argument

Petitioner argues that the prosecutor misrepresented certain evidence in her closing argument, thereby depriving him of the right to a fair trial.   Specifically, Petitioner argues that the prosecutor (1) misrepresented Dr. Stringer's testimony, and (2) misrepresented the evidence regarding the discoloration observed on Daniel Kiser's genital and anal area.

1.   Dr. Stringer's Testimony

As previously noted, Dr. Ryan Stringer examined Daniel Kiser on April 4, 2016.   In her closing argument, the prosecutor stated, "also what corroborates Daniel is the medical evidence."   (ECF No. 11-8, PageID.1348).   The prosecutor then described Dr. Stringer's testimony:

> And Dr. Stringer told you about this – his eventual diagnosis; how at first they thought was an STD, because these symptoms are rare in teens, and when you usually see them it's due to an STD.
>
> He told you how his diagnosis was orchitis-epididymo, how the three causes of this diagnosis come from some sort of infection, come from some sort of sexually-transmitted disease, or trauma.   He told you all how you are able – or he's able to rule out with a high degree of certainty that Daniel did not have an infection, because there was no evidence of an infection; no fever, no chills.   He went through a whole list about how there was no evidence for that, as well as with a high degree of certainty you can rule out STD because Daniel tested negative for that.

> So, what we're left with, ladies and gentlemen, is trauma, and it's a type of trauma that Dr. Stringer said can be caused the way that Daniel says it was caused:  by grabbing the testicles and squeezing them.   It can be caused that way.     It just so happens another one of the things that Daniel says happened is consistent and corroborated with the fact that he has this medical injury.

(*Id.,* PageID.1348-49).

Petitioner contends that the argument that Dr. Stringer testified that Daniel's symptoms were caused by trauma was a misrepresentation of the evidence, which deprived him of the right to a fair trial.   The Court is not persuaded.

The doctor diagnosed Daniel with epididymo-orchitis, or testicular inflammation, which he indicated could be caused by: (1) testicular torsion; (2) infection; or (3) traumatic injury.   (ECF No. 11-6, PageID.754-58).

The doctor observed that an ultrasound examination revealed no evidence of testicular torsion.   (*Id.,* PageID.762-63).   As for whether Daniel's symptoms were caused by an infection, Dr. Stringer's testimony was not as definitive as Petitioner suggests.   The doctor noted that there are various types of infections: (1) sexually transmitted diseases (STDs); (2) bacterial infections; and (3) viral infections.   (*Id.,* PageID.756-63).   Regarding STDs, Dr. Stringer concluded that he could rule out an STD as the cause of Daniel's symptoms with "a high degree of likelihood."   (*Id.,* PageID.757-64).   Regarding the possibility of a bacterial infection, the doctor testified that "it is impossible for me to say that it's not caused by bacteria, but it is highly unlikely with the negative urine analysis."   (*Id.,* PageID.763).   As for a potential viral infection, the doctor stated that "there's a long list of potential viruses

that can also cause epididymo-orchitis," but also noted that "it's impossible to test for those." (*Id.,* PageID.763-65).   Thus, it would appear that the doctor concluded that there existed a possibility that an infection caused Daniel's symptoms.   The doctor's subsequent testimony regarding trauma as a potential source for Daniel's symptoms, however, arguably suggested otherwise.

Regarding trauma, the doctor indicated that it was "potentially" the cause of Daniel's symptoms.   (*Id.,* PageID.765).   The doctor also clearly noted, however, that he discerned "no convincing evidence" that Daniel suffered testicular trauma.   (*Id.,* PageID.760, 766).   Accordingly, when the doctor was specifically asked "of the three [causes of epididymo-orchitis], can you say which one is more likely to have been the cause?", the doctor responded, "I cannot say with any degree of certainty." (*Id.,* PageID.766).   Immediately thereafter, however, the doctor expressly agreed with the prosecutor that "we are able, though, to rule out at least two other causes with high degree of certainty." (*Id.*).

A reasonable interpretation of the doctor's testimony was that while he discerned no evidence of trauma neither did he rule it out as a possible cause of Daniel's symptoms.   Moreover, he arguably did rule out the other two possible causes – testicular torsion and infection.   Thus, the prosecutor's argument that "what we're left with . . . is trauma," is a reasonable argument given the doctor's testimony.   As for the prosecutor's subsequent comments regarding trauma, the prosecutor did not argue that the doctor identified trauma as the cause of Daniel's symptoms.   Instead,

she merely argued that there existed evidence upon which, according to the doctor, the jury could conclude that Daniel's symptoms were caused by trauma. The Court discerns nothing improper about the prosecutor's argument.

The decision by the Michigan Court of Appeals denying this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, the court's decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, the Court rejects this claim.

2.      Discoloration Issue

As discussed above, Teresa Yoakum examined Daniel Kiser on April 27, 2016, and then again on May 18, 2016. Her initial examination revealed "some yellow coloring" on Daniel's penis and the presence of a "bluish color" in Daniel's anal area. (ECF No. 11-7, PageID.946-50). Yoakum was "unsure" whether this discoloration was due to bruising or merely a product of "different pigmentation." (*Id.,* PageID.947).

Yoakam examined Daniel three weeks later to determine whether the discoloration she observed during her initial examination was bruising or something else. (*Id.,* PageID.954). As Yoakum noted, if the initial discoloration she observed was, in fact, bruising it would have healed and not been present when Daniel returned for this second examination. (*Id.*). This second examination, however,

revealed the same two areas of discoloration as her initial examination.   (*Id.,* PageID.955-56).   Despite what this evidence suggested, the prosecutor argued:

> [Yoakum] told you how [the discoloration on Daniel's genital and anal area is] consistent with bruising, but she can't tell you when the bruise happened.   She can't tell you that.   But, again, that's another thing that is consistent with what Daniel says happened.   He says his penis was grabbed, and he has this yellowing coloring on his penis.   And he also has this blue coloring on his anal area, just like Daniel said happened.   It's from what Daniel said happened.

(ECF No. 11-8, PageID.1350-51).

To the extent that the prosecutor suggested that Yoakum testified that Daniel's discoloration was "consistent with" bruising, such is a misrepresentation of the evidence, as the Michigan Court of Appeal recognized.   *Penley*, 2018 WL 6709325 at *6.   "The reasonable conclusion drawn from Nurse Yoakum's testimony was that the yellow and blue coloring on [Daniel's] genital and anal areas was natural pigment."   *Penley*, 2018 WL 6709325 at *6.   It must also be recognized, however, that Yoakum never testified that she ruled out bruising as the cause of the discoloration in question.   In sum, while the prosecutor misrepresented the evidence, this transgression was isolated and relatively minor.   Moreover, the impact of such could easily have been countered by appropriate questioning or argument by Petitioner's counsel.

The decision by the Michigan Court of Appeals denying this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, the court's decision was not based on an unreasonable

determination of the facts in light of the evidence presented.   Accordingly, this claim is rejected.

## III.   Ineffective Assistance of Counsel

Petitioner claims that his trial counsel rendered constitutionally deficient representation.   He asserts seven distinct errors his trial attorney allegedly made. The Court finds merit in several of Petitioner's claims and, furthermore, finds that the cumulative effect of counsel's errors severely prejudiced Petitioner's cause.   The Court further finds that the decision by the Michigan Court of Appeals denying Petitioner's ineffective assistance of counsel claims constitutes an unreasonable application of clearly established federal law and, moreover, was based on an unreasonable determination of the facts presented.   Accordingly, the Court concludes that habeas relief is appropriate.

### A.   Ineffective Assistance Standard

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.   *See Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).   To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness."   *Premo*, 562 U.S. at 121 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).   The Court must apply a "strong presumption that counsel's representation was within the 'wide range'

47

of reasonable professional assistance." *Premo*, 562 U.S. at 121 (quoting *Strickland*, 466 U.S. at 689). Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 562 U.S. at 121-22 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Premo*, 562 U.S. at 122 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo*, 562 U.S. at 122 (quoting *Strickland*, 466 U.S. at 690).

As the Supreme Court has observed, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one." *Premo*, 562 U.S. at 122. Likewise, the standard by which petitions for habeas relief are judged is "highly deferential." Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential. *Ibid.* (citations omitted). As the *Premo* Court concluded:

> Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any

48

reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 122-23 (internal citations omitted).

B.     Dana Kiser's Testimony

As detailed above, Dana Kiser was questioned by the prosecutor about her sex life with Petitioner when the two were married.   Specifically, the following exchange occurred between the prosecutor and Dana:

Q:     Okay.   And how old were you when you first got together with him?

A:     We were nineteen.   Or I was nineteen.   Sorry.

Q:     Okay.   And how old are you now?

A:     Thirty-six.

Q:     Thirty-six.   Okay.   And when you were with the defendant romantically, what kind of sex was he interested in?

A:     He was interested in anal sex.   We were young.   But that – that did apply and it applied frequently throughout our – our sex life. That was something he was interested in.   I was – I was young, I was experiencing things and I wasn't closed to it.   So, I was – I was rather open to it.   And he – you know, to me that is, you know, a little rough.   But it can be, depending.   But I didn't – I'm just – I'm sorry.   I'm thinking of what happened to my son and talking about this.   I'm sorry.   But that's – that was used on a daily basis a lot of times.   Probably if we had sex – we were young.   We had sex seven days [a] week.   It happened maybe once a day in our sex life.

Q:     Anal sex did?

A:     Yes.

49

Q:      You said once a day in your sex life?

A:      Uh-huh (affirmative).

Q:      Okay.   So, you frequently had anal sex with the defendant.

A:      Yes.

Q:      And was it rough sex?

A:      It could be rough, yes.

Petitioner argues that his trial counsel's decision not to object to this testimony constituted deficient performance that prejudiced the outcome.   The Court agrees.

At the *Ginther* hearing, Petitioner's counsel expressly conceded that there was no strategic reason for his failure to timely object to this testimony.   (ECF No. 11-12, PageID.1756).   As counsel further stated, "there's no question I should have objected."   (*Id.,* PageID.1756-57).   Counsel further conceded that Dana Kiser essentially communicated to the jury that Petitioner was "obsessed with anal sex." (*Id.,* PageID.1758).   Regrettably, it did not occur to counsel "until much, much later" that he should have objected.   (*Id.,* PageID.1757-58).   By this time, however, counsel made the decision not to object or seek a curative instruction because he "didn't want to emphasize the point."   (*Id.,* PageID.1757).

It is important to recognize that, through his own testimony, counsel conceded that, on the question whether to object to Dana's testimony, there were essentially two decision points: (1) whether to object at the outset of her testimony, thereby preventing the undue prejudice resulting from this plainly inadmissible evidence, and

50

(2) having failed to timely object, whether to belatedly object in an attempt to ameliorate the unfairly prejudicial impact of the testimony in question.[6]

It is likewise important to note that this was not a circumstance where counsel could not have anticipated the need to object until after the damaging testimony had been offered.   As soon as the prosecutor asked Dana to comment on her sex life with Petitioner, a reasonably competent attorney would have immediately objected, thereby preventing the jury from learning that Plaintiff was allegedly "obsessed with anal sex."

Counsel conceded that his decision not to timely object lacked any strategic value or purpose, but he attempted to excuse this failure by asserting that, by the time he realized, "much, much later," that he should have objected, he chose not to act because he "didn't want to emphasize the point."

The Michigan Court of Appeals rejected Petitioner's claim finding, unreasonably, that counsel did not even render deficient performance.   *Penley*, 2018 WL 6709325 at *3.   Specifically, the court found that "the decision not to object was a matter of trial strategy."   *Ibid.*   Implicit in the court's statement is that counsel's decision not to act constituted a reasonable strategy.   To reach this conclusion, however, the court conflated counsel's decision not to *timely* object with his much

---

6 To put it in simpler terms, the distinction between these two decision points is the difference between choosing to close the barn door to prevent the escape of a horse and deciding whether to try and catch the horse after it has already made its way down the road.

belated decision not to attempt to offset the damage done by his failure to timely object. The court of appeals simply ignored counsel's failure to timely object and, instead, solely analyzed counsel's decision not to attempt to ameliorate his error. The Court finds this approach unreasonable and unsupportable. But, even if the Court were to overlook this analytical error, the decision by the court of appeals is nonetheless deficient.

First, the conclusion that it was reasonable for counsel not to belatedly object or seek a curative instruction is rejected. Counsel and the Michigan Court of Appeals both reasoned that objecting after-the-fact "would have given [the objectionable testimony] more emphasis." While this rationale may apply to circumstances involving brief or isolated comments, Dana Kiser's testimony about Petitioner's obsession with anal sex was hardly brief or isolated. Instead, Dana testified at length about Petitioner's obsession culminating with her assertion that Petitioner's desire for anal sex often got "rough."

The Court discerns no legitimate strategic purpose in these circumstances *not* to object and request a curative instruction of some kind. After all, as the Michigan Court of Appeals acknowledged elsewhere in its opinion, "jurors are presumed to follow their instructions." *Penley*, 2018 WL 6709325 at *6. Any concern that a belated objection would "highlight" the objectionable testimony is undermined by the presumption that the jury would have followed the trial court's instruction to disregard it.

Moreover, the state court's conclusion that counsel's failure to belatedly act was reasonable and competent representation is in direct contradiction with its own analysis.   As noted above, Petitioner asserted that the prosecutor's decision to elicit Dana Kiser's testimony constituted misconduct.   The Court rejected this claim, in part, on its conclusion that "a proper objection [to Dana's testimony] could have cured any prejudicial effect from the testimony."   *Penley*, 2018 WL 6709325 at *10.

Thus, in the context of Petitioner's ineffective assistance of counsel claim, the Michigan Court of Appeals concluded that counsel did not render deficient performance by failing to object to admittedly inadmissible and unfairly prejudicial testimony, despite concluding that an objection would have ameliorated any undue prejudice resulting from counsel's initial failure to act.   Stated differently, the court concluded that it was not deficient performance to fail to take any corrective action to minimize the damage caused by counsel's deficient performance in failing to object in the first place.   The Constitution, and *Strickland*, demand more.

Furthermore, even if the Court assumes that counsel's decision not to belatedly object constituted a valid strategic choice, this determination says nothing about counsel's failure to timely object when such would have prevented altogether the presentation of the testimony in question.   Counsel conceded that *this* decision constituted deficient performance.   The Michigan Court of Appeals nevertheless disregarded this admittedly deficient decision because counsel's subsequent decision not to belatedly rectify his error was allegedly a reasonable strategic choice.

The Michigan Court of Appeals reached its conclusion because the testimony in question was so highly and unfairly prejudicial that it was, in the court's view, reasonable to take no action to ameliorate the prejudice by seeking a curative instruction or other relief because such action would have highlighted for the jury the unfairly prejudicial evidence.   By this logic, the failure to timely object to unduly prejudicial evidence cannot be considered deficient performance so long as counsel responds to his initial error by making no attempt to rectify it – or, to put it another way, the greater the unfair prejudice, the more reasonable the decision not to seek curative relief.   This hardly constitutes the type of "active and capable advocacy" *Strickland* is intended to protect.   *See Harrington v. Richter*, 562 U.S. 86, 110 (2011) (representation "is constitutionally ineffective" where it "so undermined the proper functioning of the adversarial process that the defendant was denied a fair trial").

With respect to Dana Kiser's testimony regarding Petitioner's obsession with anal sex, there was no adversarial process.   Counsel unreasonably failed timely to recognize that an objection was necessary and, moreover, once he realized his error, again failed to take action.   The prosecution purposely presented to the jury unfairly prejudicial evidence in response to which Petitioner's counsel did nothing.   Through his complete inaction, counsel failed in his adversarial obligations.   The Michigan Court of Appeals condoned this inaction, despite universal acknowledgement that Dana Kiser's testimony was highly improper and unfairly prejudicial, and, despite that court's own conclusion that a belated objection could have cured that prejudice.

In sum, the Michigan Court of Appeals found that counsel's failure to object to Dana Kiser's testimony did not constitute deficient performance.  As explained herein, the Court finds that this decision constitutes an unreasonable application of clearly established federal law.

Moreover, this is not the sole instance of deficient performance.  The cumulative impact of the prejudice resulting from counsel's many errors will be assessed below.

C.      Petitioner's Criminal History

In his opening statement, Petitioner's counsel stated:

[Petitioner is] gonna tell you, he's not the best person in the world in many respects.  He has a criminal record, he's been to prison.  But there's never been any prior sexual acts at all.  There have been property type crimes or that type of thing.  He'll be very forthright about that."

(11-5, PageID.562).

Later, in response to his counsel's questions, Petitioner testified:

Q:      Okay.   Before we go any further, do you have a criminal record?

A:      Yes, I do.

Q:      Tell us what's on your criminal record.

A:      See, in 1990 I got a marijuana charge.  In '93 I got a B and E charge.   In 2004 I have possession of counterfeit bank notes, and at the same time I had a second-degree home invasion.   And then in 2011 I had a possession of methamphetamine charge.

Q:      Ever been to prison?

A:      Yes, sir.

55

Q:      How many times?

A:      Twice.

Q:      Okay.   And for what charges was that?

A:      I had went for – when I was on probation for the B and E charge
        in '93, I had went to prison in '97, did, like, I think, fifteen months
        and got paroled.   And then in 2005 I had went back for the
        probation violation for the counterfeit of bank notes.

Q:      Ever been charged with any sex crimes?[7]

A:      Never.   Never.

Q:      Not even been charged for anything like that?

A:      Never.   Never been charged for sex crimes, never been accused
        for sex crimes at all.

Q:      And when you've been charged for these other offenses, what have
        you done?

A:      Every time I've been charged with a crime, I've took my
        responsibility and faced my time.

Q:      And why aren't you doing that this time?

A:      Because I didn't do this.

(11-8, PageID.1197-98).

At the outset, it must be recognized that there is no suggestion in the record

that Petitioner's criminal history would have been admissible had the prosecutor

sought to introduce it.   The Michigan Court of Appeals recognized that evidence of

---

[7] Notably, counsel did not ask Petitioner if he had ever *committed* a sex crime, but
rather, merely whether he had ever been *charged* with one.   This distinction likely
was not lost on the jury.

Petitioner's criminal history was "otherwise inadmissible." *Penley*, 2018 WL 6709325 at *7.

At the *Ginther* hearing, counsel testified that his strategy in informing the jury that Petitioner had previously been convicted of multiple felonies involving drugs, home invasion, and possession of counterfeit bank notes was "to establish . . . the fact that [Petitioner] had no criminal history as far as sexual conduct's concerned." (ECF No. 11-12, PageID.1728). Counsel apparently failed to consider the impact this information would have on a jury. As counsel stated, "who cares" about Petitioner's criminal history, the "real issue was, was he a person who had committed or would commit a criminal sexual conduct." (*Id.,* PageID.1728-29). Counsel repeatedly asserted that he did not believe that it would prejudice Petitioner's cause for the jury to know he had been previously convicted of multiple felonies. (*Id.,* PageID.1729-34).

The Michigan Court of Appeals denied this claim. Specifically, the court concluded:

> admitting guilt to some crimes, while maintaining innocence to others has been recognized by this Court as a risky but permissible trial tactic to improve defendant's credibility. Given the circumstances, trial counsel's strategy was not unreasonable. The termination of defendant's parental rights and his fractured relationship with his children was a matter of some relevance to this case and the termination was, in part occasioned by defendant's incarcerations. Allowing evidence of convictions that were otherwise inadmissible was a risky strategy. However, given the fact that his criminal history was likely to be referenced, we cannot say that the trial court's determination that it was not unreasonable to, at least demonstrate that defendant had no

history of criminal sexual assault was outside the range of principled outcomes.

*Penley*, 2018 WL 6709325 at *7.

The Court is cognizant that it must "resist the temptation to second-guess an attorney's strategic decisions after an adverse verdict or sentence" and must instead indulge the "strong presumption that counsel's conduct falls within the range of reasonable professional assistance." *Potter v. Green*, 814 Fed. Appx. 118, 125 (6th Cir., June 5, 2020) (quoting *Strickland*, 466 U.S. at 689). Were the Court evaluating this claim in the first instance, it would have little difficulty concluding that counsel's strategy in this regard was seriously ill-advised and ill-considered. But, in light of the deference the Court must afford to the decision by the Michigan Court of Appeals, the Court, albeit reluctantly, finds that this claim does not merit habeas relief. Accordingly, this claim is rejected.

### D.    Suicide Note and Teresa Yoakum's Report

When questioned by the prosecutor, Daniel Kiser stated that he had a brother, Brandon, who committed suicide "a couple years ago" when he was sixteen years old. (ECF No. 11-6, PageID.728). Teresa Yoakum testified that Daniel disclosed that his brother, Brandon, committed suicide and "left a note after his suicide saying that he didn't want to be like his dad [Petitioner]." (ECF No. 11-7, PageID.969-70).

Yoakum's written report of her examination of Daniel was subsequently admitted into evidence with "no objection" from Petitioner's counsel. (*Id.,*

PageID.929).   In her report, which was shared with the jury, Yoakum recorded Daniel's statements regarding his brother's suicide.   (ECF No. 11-13, PageID.2279-85).   Specifically, Yoakum wrote: "I had a brother Brandon who killed himself.   He left a note saying he didn't want to be like Dad.   I think he touched him too."   (*Id.*, PageID.2284).   There is no indication in the record that the alleged suicide note Daniel spoke about even exists.   At the *Ginther* hearing, counsel testified that the prosecutor never produced a copy of the alleged suicide note and, thus, he had never even seen it.   (ECF No. 11-12, PageID.1749).

Petitioner argues that his attorney rendered deficient performance vis-à-vis the admission of Teresa Yoakum's report.   The Court agrees.   In this respect, counsel made two errors, both of which constitute constitutionally deficient performance.   First, there was no legitimate strategic reason for counsel to willingly concede the admission into evidence of Yoakum's report, given that it contained her hearsay recollection that Daniel Kiser stated that he thought Petitioner "touched [Brandon] too."   This utterly undermined counsel's ill-advised strategy of introducing Petitioner's extensive criminal history, as it certainly suggested that Petitioner was, in fact, the kind of person that would commit criminal sexual conduct.

Second, given that Daniel Kiser's statements to Yoakum about Brandon's suicide were premised on the suicide note that Brandon allegedly authored, counsel's failure to request a copy of the note constitutes constitutionally deficient performance.   A competent attorney would have recognized the need to request a

59

copy of the purported suicide note in the event that Yoakum's report was admitted without redaction of the objectionable content, and a competent attorney would have made such a request. The reasons for this should be obvious. Assuming the suicide note exists, competent counsel would want to compare the contents of that note with the hearsay statements in Yoakum's report to prepare for the cross-examination of Daniel Kiser and/or Teresa Yoakum. And, in the event that no such note does exist, competent counsel would want to know this fact so that Daniel could be questioned about alleged comments he made regarding a non-existent suicide note.

Instead, at the *Ginther* hearing, counsel simply failed to grasp the distinction between the fact that Brandon committed suicide and the possibility that he left behind a note regarding his suicide. (ECF No. 11-12, PageID.1734-35, 1743-1755). Counsel appears to have been focused only the fact of Brandon's suicide. Counsel disputed that Brandon's suicide and his purported suicide note were "two different topics" and, instead, insisted that they were "the same issue, the same thing: somebody committed suicide." (*Id,*. PageID.1746). As counsel testified, he "had no idea what was in" the alleged suicide note. (*Id.*). Despite this concession, counsel nonetheless stated that he wanted the suicide note to be introduced into evidence and, moreover, he did not consider its contents harmful to Petitioner's cause. (*Id.*, PageID.1747-48).

The Michigan Court of Appeals rejected this claim on the ground that counsel did not render deficient performance. *Penley*, 2018 WL 2018 WL 6709325 at 3-4.

This conclusion represents an unreasonable application of clearly established federal law.   Accordingly, the Court finds that counsel's failure constituted deficient performance.   The cumulative prejudicial effect of this failure will be assessed below.

E.   "Valid Disclosure"

As discussed herein, Amelia Harper interviewed Daniel Kiser.   Brooke Rospierski later testified concerning her opinion of Harper's interview.   Specifically, Rospierski concluded that Daniel's allegations constituted "a valid disclosure" of sexual assault.   Petitioner argues that his counsel rendered deficient performance by failing to object to this testimony or counter such with appropriate questioning or clarification.   The Court agrees.

In rejecting this claim, the Michigan Court of Appeals concluded that "Rospierski's use of the word 'valid' referred to the process by which the disclosure was obtained and not to what [Daniel Kiser] actually said."   *Penley*, 2018 WL 6709325 at *5.   The Court further concluded that counsel's "decision not to object was objectively reasonable and defendant was not prejudiced by the testimony because it did not vouch for [Daniel's] credibility."[8]   *Ibid*.   This analysis does not survive scrutiny.

---

[8] As the Michigan Court of Appeals recognized, it is improper under Michigan law for an expert to "testify with regard to whether the victim's allegations are truthful or whether sexual abuse in fact occurred."   *Penley*, 2018 WL 6709325 at *5.

The court of appeals is correct that Rospierski, at the outset of her testimony, testified about the protocol that Harper employed when talking with Daniel.   (11-7, PageID.973-86).   Several things are notable about this testimony, however. Rospierski never used the term "valid" in her discussion about the forensic interview protocols.  She never expressly, or even implicitly, made any connection between adherence to the forensic interview protocols and the presumed validity of a child's disclosure.

Simply put, no reasonable lay juror could, after hearing Rospierski's initial testimony, be expected to intuitively understand that an allegedly "valid disclosure" meant nothing more than adherence to the forensic interviewing protocols. [9] Furthermore, an examination of the context in which Rospierski' used the term "valid" belies the Michigan Court of Appeals conclusion that "Rospierski's use of the word 'valid' referred to the process by which the disclosure was obtained and not to what [Daniel] actually said."

Rospierski used the term "valid" on four occasions during her testimony.   The first instance was in response to a question from the prosecutor asking Rospierski to describe  the  ranges  of  reactions  exhibited  by  rape  victims.    (ECF  No.  11-7, PageID.987).   In response, Rospierski indicated that "children display a wide range of behaviors or indicators when they're talking."   (*Id.*).   She then indicated that "we

---

[9] Contrary to the trial court's suggestion, it is not reasonable to expect lay jurors to be trained in "the field of logic."   (ECF No. 11-13, PageID.2020).

tend not to base how a kid reacts on whether or not it's a valid disclosure of sexual contact, because they can display a wide range of emotions." (*Id.*).   Rospierski's answer is focused on the child's response, not adherence to interview protocols.

The second instance in which Rospierski used the term "valid" was in response to questioning by Petitioner's counsel.   Specifically, counsel asked Rospierski if she even considered whether the statements Daniel made to Harper were inconsistent with statements Daniel made to others.    (*Id.,* PageID.1003).    In response, Rospierski provided several statements, culminating with "[d]uring that interview I thought that he was consistent in his statements.   He provided several sensory details of what had happened to his body.   And I consider that, what he said during that inter – a valid disclosure of sexual contact." (*Id.,* PageID.1003-04).   Again, Rospierski's response is focused on Daniel's statements, and the perceived consistency thereof, without any reference to the interview protocols.

The prosecutor later revisited this point, asking Rospierski if she "had anything to say" on the topic of the "details and consistency" provided by an alleged assault victim.   (*Id.,* PageID.1005).   In response, Rospierski stated:

> Major details like – you know, I think it just goes back to looking at that interview and that child as a whole and not taking things out of context. And so, if that child has been consistent with what's happened and they're able to provide those specific and sensory details, that's what we're looking for in consistency and saying it's a valid disclosure or not."

(*Id.,* PageID.1005-06).

Again, Rospierski makes no reference to the interview protocols, but instead focuses on the child's responses and their perceived consistency.   Finally, the prosecutor asked Rospierski, "and, again, from reviewing the interview of Daniel, he provided a valid disclosure?" to which Rospierski responded, "correct."   (*Id.,* PageID.1007).   Again, Rospierski makes no reference to the interview protocols and instead is focused on Daniel's statements.

Simply put, there is nothing in the context of Rospierski's use of the term "valid" that equates that term with – or is limited to – adherence to the interview protocols.   Thus, it would be quite reasonable for a lay juror to interpret Rospierski's testimony as communicating that Daniel's allegations were "valid" because they were truthful or, at least perceived by Rospierski and Harper to be truthful.   Moreover, even if the Court assumes that the jurors understood that Rospierski's use of the word "valid" merely communicated that the interview protocols were adhered to, the result here is the same.

In her initial testimony describing the forensic interview protocols, Rospierski stated that "the most important" forensic interview protocol, which is emphasized with the children they interview, is "sticking to the truth."   (11-7, PageID.982-83).   Thus, it would have been quite reasonable (and logical) for a juror to make the following connections based on the totality of Rospierski's testimony: (1) Rospierski considered Daniel's allegations of sexual assault to be valid; (2) such allegations are valid only if they comply with the forensic interview protocols; (3) one of the protocols

is that the child "stick to the truth"; (4) thus, Kiser's allegations must have been truthful or, at least, considered truthful by Harper and Yoakum.

Given the improper and highly prejudicial effect either interpretation of Rospierski's testimony would have had, and apparently did have, on Petitioner's cause, any competent attorney would have (1) objected to the testimony in question, thereby obtaining from the court the necessary clarification or limiting instruction; and (2) if necessary, use cross examination to clarify the matter.   Counsel's failure to accomplish either constitutes deficient performance.

The Michigan Court of Appeals rejected this claim on the ground that counsel did not render deficient performance.  *Penley*, 2018 WL 2018 WL 6709325 at *5. This conclusion represents an unreasonable application of clearly established federal law.   Accordingly, the Court finds that counsel's failures, constituted deficient performance.   The prejudicial impact of this failure is assessed below.

F.     Shackling

It is well understood that, during trial, placing a criminal defendant in physical restraints visible to the jury is forbidden unless doing so is "justified by an essential state interest – such as the interest in courtroom security – specific to the defendant on trial."  *Deck v. Missouri*, 544 U.S. 622, 624 (2005).   One of the rationales articulated for this rule is that to permit the jury to see a criminal defendant in restraints "undermines the presumption of innocence and the related fairness of the

factfinding process.   It suggests to the jury that the justice system itself sees a need to separate a defendant from the community at large."   *Id.* at 630 (citations omitted).

As previously noted, Petitioner was shackled to the floor during his trial.[10] Prior to Petitioner's counsel beginning his direct examination of Petitioner, the trial court offered counsel an opportunity to briefly pause the proceedings so that the jury could be removed from the courtroom thereby enabling Petitioner to take the witness stand without the jury observing that he was in physical restraints.   Counsel declined the court's offer because he was not trying to hide the fact that Petitioner was presently in jail.   Petitioner argues that counsel's decision was constitutionally deficient.   The Court agrees.

First, the Court must address the argument that Petitioner has procedurally defaulted this argument.   The Michigan Court of Appeals concluded that its review was limited to plain error because Petitioner failed to preserve the issue below. *Penley*, 2018 WL 6709325 at *9.

On December 21, 2016, the trial court sentenced Petitioner.   (ECF No. 11-10). Prior to sentencing, however, the court held a hearing on the motion for new trial filed by Petitioner's trial counsel.   At this hearing, Petitioner clearly asserted that

---

10 The trial court justified shackling Petitioner to the floor on two things: (1) the vague and uncorroborated opinion by a Deputy that Petitioner "does not want to spend any time in prison and that he would do whatever he needs to get out of it"; and (2) the hearsay statement from another Deputy that Petitioner "should be considered a security risk."   (11-5, PageID.7-11).   While not directly relevant to the resolution of this claim, this justification falls well short, in the Court's estimation, of demonstrating an "essential state interest."

his trial counsel had improperly, and without his consent, waived his right to keep his shackles hidden from the jury.   (ECF No. 11-10, PageID.1622).   The judge heard argument on the issue and ultimately rejected Petitioner's argument.   (*Id.,* PageID.1622-26).   The Court finds, therefore, that Petitioner did, in fact, assert in the trial court his claim that counsel rendered ineffective assistance by waiving his right to keep his shackles hidden from the jury.

After sentencing, Petitioner was appointed separate appellate counsel who likewise moved in the trial court for a new trial.   (ECF No. 11-13, PageID.1881-1916).   While Petitioner's appellate counsel did not re-assert this particular claim in his motion, Respondent has identified no authority under which Petitioner was required to present to the trial court a second time a claim that was previously rejected.   To the extent, however, that such authority exists and results in the conclusion that Petitioner has procedurally defaulted this claim, the Court finds that cause and prejudice exists sufficient to overcome it.

Turning to the merits of Petitioner's claim, as already noted, counsel suggested that Petitioner would not be prejudiced by the jury seeing him in restraints because he was not trying to conceal the fact that Petitioner was presently in jail.   Counsel's thought process reflects a profound misunderstanding of the concerns implicated when a jury sees a criminal defendant in physical restraints.   It is not merely that the jury will conclude that the defendant is presently in jail.   Rather, the concern is

that the jury will perceive the defendant as someone too dangerous to remain in the community and who, therefore, is not presumed innocent.

There was no valid strategic reason to allow the jury to observe Petitioner in physical restraints.   This is underscored by recognizing the adverse effect counsel's decision had on his professed strategy of communicating to the jury that, while Petitioner had previously committed several felonies, he was not guilty of the present felony charges.   By purposely allowing the jury to see Petitioner in shackles, counsel undermined the presumption of innocence and gravely undercut his own strategy.

The Michigan Court of Appeals rejected this claim on the ground that "Defendant waived this issue at trial."  *Penley*, 2018 WL 6709325 at *9.   It is not clear whether the court found that *counsel* waived Petitioner's right not to be observed in shackles by the jury or whether instead Petitioner waived this right himself.   The Court need not solve this conundrum, however, as neither justification supports the denial of this claim.[11]

The Michigan Court of Appeals based its waiver determination entirely on the exchange, which transpired immediately before Petitioner took the stand:

The Court:          Are you ready, Mr. Jesse?

---

[11] The Michigan Court of Appeals mischaracterized Petitioner's claim, interpreting it as an assertion that "trial counsel was ineffective for not objecting to defendant being shackled." *Penley*, 2018 WL 6709325 at *9.   A review of the brief presented to the Michigan Court of Appeals, however, reveals that Petitioner's claim was articulated much differently.   In his brief, Petitioner plainly asserted that counsel rendered ineffective assistance by making the decision to allow the jury to see him in shackles prior to taking the stand to testify.   (ECF No. 11-13, PageID.2071).

| | |
|---|---|
| Mr. Jesse: | We are, your Honor. |
| The Court: | Ms. Wainwright? |
| Ms. Wainwright: | Yes, your Honor. |
| The Court: | Call your first witness, - - |
| Mr. Jesse: | We call - - |
| The Court: | - - Mr. Jesse. |
| Mr. Jesse: | - - Mr. Penley. |
| The Court: | Mr. Penley, come on up here.   Let's take a short break in the jury room. |
| Mr. Jesse: | Your Honor, I don't have a problem with it.   He admits he's in jail; he's in jail now.   We aren't trying to hide that. |
| The Court: | All right. |
| Mr. Jesse: | So, I - - I have no problem with that. |
| The Court: | All right. |
| Mr. Jesse: | So - - so, just unchain him so he can go - - |
| Petitioner: | Yeah. |

(ECF No. 11-8, PageID.1192-93).

First, to the extent that the Michigan Court of Appeals determined that Petitioner waived his right to keep his shackles hidden from the jury, such is rejected. Neither counsel nor the trial judge questioned Petitioner to determine whether Petitioner, in fact, desired to waive his right to keep his shackles hidden from the jury.   Thus, the determination that Petitioner waived the right in question can only

be based upon Petitioner's utterance of the single word "yeah."   It is not clear, however, to whom, or in response to what, Petitioner was speaking when he made this comment.   To find that a criminal defendant has waived a constitutional right, the court must find that the defendant knowingly, voluntarily, and intelligently decided to relinquish a known right.   *See, e.g., Iowa v. Tovar*, 541 U.S. 77, 81 (2004) ("[w]aiver of the right to counsel, as of constitutional rights in the criminal process generally, must be a knowing, intelligent act done with sufficient awareness of the relevant circumstances").   Petitioner's unprompted single word utterance falls well short of satisfying this standard.

Next, to the extent that the court determined that counsel waived Petitioner's right to keep his shackles from the jury's view, such is irrelevant.[12]   The fact that counsel could waive this right for Petitioner says nothing about the wisdom of doing so, which is the essence of Petitioner's claim.   The Michigan Court of Appeals completely failed to address this question.   Regardless, the court's apparent conclusion that such did not constitute deficient performance is unreasonable and, therefore, rejected.   The Court discerns no legitimate strategic reason for counsel's decision and none has been suggested.   Accordingly, the Court finds that counsel's

---

[12] There is some authority for the proposition that counsel has the authority to waive this right on Petitioner's behalf.   *See, e.g., United States v. Reynolds*, 2021 WL 3509160 at *2-4 (7th Cir., Aug. 10, 2021) (observing that the Supreme Court has never held that a defendant's right to keep his shackles out of view of the jury cannot be waived by his attorney).

decision to waive Petitioner's right to keep his shackles hidden from the jury was constitutionally deficient.

In sum, the decision by the Michigan Court of Appeals rejecting this claim constitutes an unreasonable application of clearly established federal law. Accordingly, the Court finds that counsel's failure constituted deficient performance. The cumulative prejudicial effect of this failure will be assessed below.

G.     Prosecutor's Closing Argument

As discussed above, Petitioner argued that the prosecutor acted improperly by mischaracterizing Dr. Stringer's testimony in her closing argument.   Petitioner now argues that counsel rendered deficient performance by failing to object or respond to the prosecutor's argument regarding this testimony.   As previously discussed, the Court discerned nothing improper about the prosecutor's argument regarding Dr. Stringer's testimony.   Because the prosecutor's argument in this regard was not improper, counsel's decision to neither object nor respond directly to the prosecutor's argument was not deficient performance.

The Michigan Court of Appeals rejected this claim on this basis.   *Penley*, 2018 WL 6709325 at *6.   This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, the court's decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim presents no basis for habeas relief.

H.     Petitioner's Closing

Finally, Petitioner argues that counsel rendered deficient performance by providing an "ineffective" closing argument to the jury.   While Petitioner identifies many perceived deficiencies in counsel's closing argument, these arguments amount to little more than a disagreement concerning strategy.   The Court does not disagree, with the benefit of hindsight, that counsel's closing argument was not particularly effective.   Petitioner has failed, however, to overcome the strong presumption that counsel's strategy in this regard was, at the time, not unreasonable.   The Michigan Court of Appeals rejected this claim on this basis.   *Penley*, 2018 WL 6709325 at *8. This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, the court's decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim presents no basis for habeas relief.

I.     Cumulative Prejudicial Effect

As discussed herein, the Court finds that Petitioner's trial counsel rendered constitutionally deficient performance in four separate respects: (1) failure to object to Dana Kiser's testimony regarding anal sex; (2) failure to object to the introduction of Teresa Yoakum's report, particularly Daniel Kiser's hearsay statements and the contents of Brandon Kiser's purported suicide note; (3) failure to object or correct Brooke Rospierski's testimony that Daniel Kiser's allegations constituted a "valid

disclosure" of sexual assault; and (4) waiving Petitioner's right to keep his physical restraints hidden from the jury.

Having determined that Petitioner's trial counsel rendered deficient performance, the question becomes whether such prejudiced Petitioner's defense. To establish prejudice, Petitioner must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Premo*, 562 U.S. at 122. Moreover, when an attorney makes multiple unprofessional errors, the Court "does not measure the result of each individual error, but considers the errors of counsel in total, against the totality of the evidence in the case." *United States v. Arny*, 831 F.3d 725, 734 (6th Cir. 2016). Considering the nature and importance of counsel's errors and the overall weakness of the evidence against Petitioner, the Court concludes that Petitioner was unfairly prejudiced by his trial counsel's many unprofessional errors.

### 1. The Evidence Against Petitioner was Not Overwhelming

Respondent argues that, even if counsel's performance was deficient, relief is not warranted because the evidence against Petitioner was "abundant" and "overwhelming." The Court is not persuaded.

First, the medical evidence does not corroborate Daniel Kiser's allegations. In this respect, it is important to recognize the distinction between Daniel's subjective allegations, on the one hand, and the results of medical tests or examinations and the

opinions of medical professionals.   Only the latter are properly characterized as medical evidence.

Daniel testified that, following the first alleged assault, he began experiencing testicular pain for which he went to the emergency room for treatment.   (ECF No. 11-5, PageID.624-25).   Daniel was first examined on March 29, 2016.   (ECF No. 11-6, PageID.774).   Daniel reported that earlier that day he was struck in the scrotum with a thrown "object," specifically a "marker," which prompted him to report to the emergency room.   (*Id.,* PageID.775-76).   In this respect, Dr. Stringer acknowledged that "a marker being thrown to the testicular area could cause pain and would be a cause of trauma, yes."   (*Id.* PageID.783).   An examination revealed bilateral testicular swelling, but an ultrasound examination revealed that Daniel's testicles "appear normal."   (*Id.,* PageID.775).   There is nothing in the record suggesting that this examination revealed anything identifying the cause of Daniel's symptoms.

Daniel was examined by Dr. Stringer on April 4, 2016.   (*Id.,* PageID.748-49). Dr. Stringer's examination of Daniel revealed no evidence that explained or corroborated Daniel's symptoms.   The doctor observed that Daniel's symptoms could be caused by trauma, infection, or torsion, but the doctor's examination revealed no evidence of any of these conditions.   The doctor acknowledged that he could not determine the cause of Daniel's symptoms.   (*Id.,* PageID.778-79).   In fact, the doctor conceded that Daniel's symptoms could have been caused by "any number of things."

(*Id.,* PageID.779).    The doctor's examination likewise revealed no evidence of bruising on Daniel's neck or arms and no evidence of tenderness of Daniel's neck. (*Id.*).

Daniel reported that, following the first alleged assault, he began "peeing blood." (ECF No. 11-5, PageID.611).   There is no evidence, medical or otherwise, substantiating this allegation.   Daniel also reported that following his initial assault he began experiencing difficulty urinating.   (*Id.,* PageID.624).   Again, there is no evidence, medical or otherwise, substantiating this allegation.    Subsequent examination determined that Daniel was experiencing "urinary retention" for which he was catheterized.   (ECF No. 11-6, PageID.754-57, 767-68).   No medical opinion or evidence was ever presented, however, even suggesting a cause for Daniel's apparent urine retention.

Teresa Yoakum examined Daniel on April 27, 2016.   (ECF No. 11-7, PageID.927).   Daniel reported that he was still "urinating blood."   (*Id.,* PageID.933). There is no evidence that Yoakum was able to confirm this allegation.   Likewise, Yoakum's examination revealed nothing corroborating or confirming Daniel's complaints of assault or testicular pain.   As discussed above, Yoakum's examination revealed only discoloration of Daniel's genital and anal area which she conceded was not caused by bruising or trauma.   To be sure, the medical evidence does not refute Daniel's allegations, but neither does it corroborate or confirm them.

As previously noted, there were also inconsistencies in Daniel's allegations. Daniel told the police that Petitioner first assaulted him in December 2015, "around" or "before" Christmas.  (ECF No. 11-7, PageID.1161, 1171).  Daniel also told the police, however, that the initial assault occurred two weeks before he went to the hospital in March 2016.  (*Id.,* PageID.1162).  At trial, Daniel testified that he could not recall when the initial assault occurred.   (ECF No. 11-6, PageID.669-70). Daniel also provided inconsistent statements concerning the timing of the two alleged assaults.   At one point, Daniel reported that the two assaults happened on consecutive days, but later asserted that the two incidents were "about a week" apart, two weeks apart, or possibly even months apart.   (ECF No. 11-5, PageID.612; ECF No. 11-6, PageID.669-70, 674-75, 681-82; ECF No. 11-7, PageID.1162, 1172).

There was also evidence that Daniel was upset about Petitioner's decision to end his relationship with Melissa Watson and to begin a relationship with Emily Horvath, after which Petitioner began spending a great deal of time away from home. (ECF No. 11-7, PageID.1026-30, 1058-59, 1077-78; ECF No. 11-8, PageID.1204-08, 1251).   Daniel was allegedly so upset about this turn of events that he stated that he would "start a rumor" about Petitioner.   (ECF No. 11-7, PageID.1069).   There was also some evidence that Daniel was untruthful and desired attention. (ECF No. 11-7, PageID.1060, 1072, 1133; ECF No. 11-8, PageID.1275-76,1315-16).

The jury's own verdict undercuts any argument that the evidence against Petitioner was overwhelming.   Petitioner was charged with three offenses for each

76

of the two alleged incidents.   The jury convicted Petitioner of the three offenses associated with one of the alleged assaults but acquitted him of the charges associated with the second alleged assault.   While the rationale for the jury's decision is unknown, it is not reasonable to argue that the jury interpreted the evidence as "overwhelming."   Had such been the case, the jury would have convicted Petitioner on all six counts.

The Court is not suggesting that Petitioner's conviction was based on less than sufficient evidence.   Depending on what testimony the jury chose to credit and believe, there was certainly sufficient evidence to support Petitioner's convictions. But it cannot be said that the evidence presented at trial was overwhelming.

2.   The Impact of Counsel's Errors

Counsel's failures resulted in the following inadmissible and unfairly prejudicial evidence being presented to the jury.   Dana Kiser's testimony that Petitioner was obsessed with anal sex that often got rough.   Teresa Yoakum's report and its notation that Daniel Kiser believed that Petitioner sexually assaulted his brother, Brandon, prior to his suicide.   Brooke Rospierski's unchallenged testimony that Daniel's allegations were a "valid disclosure" of sexual assault, which could reasonably have been interpreted as vouching for Daniel's credibility.

Counsel further prejudiced Petitioner by willingly allowing the jury to see him in shackles, thereby undermining the principle that Petitioner was presumed innocent.

Considering the relative weakness of the prosecutor's case overall, the Court must conclude that, absent counsel's many unprofessional errors, there exists a "reasonable probability that . . . the result of the proceeding would have been different."   Accordingly, habeas relief is appropriate.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is being confined in violation of the United States Constitution.   Accordingly, and for the reasons stated herein, the Court will enter a separate Judgment granting Kenneth Penley's petition for writ of habeas corpus.   The Court will further order the State of Michigan to release Petitioner from custody or afford him a new trial within 120 days.

**IT IS SO ORDERED.**

Date: February 28, 2023                               /s/ Phillip J. Green
                                                                PHILLIP J. GREEN
                                                                United States Magistrate Judge